## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTHERN TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| ZHANG YANG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NOBILIS HEALTH CORP., HARRY FLEMING, DAVID YOUNG, and KENNETH J. KLEIN,<br><br>Defendants. | Case No. 4:19-cv-00145<br><br>AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Zhang Yang ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's Amended Class Action Complaint against Defendants Nobilis Health Corporation ("Nobilis" or the "Company"), Harry Fleming ("Fleming") David Young ("Young") and Kenneth J. Klein ("Klein") (collectively the "Defendants"), alleges the following based upon personal knowledge as to Lead Plaintiff and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company, interviews with Confidential Witnesses ("CWs") and information readily obtainable on the Internet.  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a class action on behalf of persons or entities other than Defendants, who purchased or otherwise acquired Nobilis' common stock between May 8, 2018 and April 11, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws, and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.       Nobilis is a full-service healthcare development and management company, with more than 30 locations across Texas and Arizona, including hospitals, ambulatory surgery centers, and multi-specialty clinics. In addition, the Company partners with more than 30 facilities across the country, and purports to deploy a unique patient acquisition strategy driven by proprietary, direct-to-consumer marketing technology that focuses on a specified set of procedures performed at its facilities by local physicians.

3.       The Company has had a precipitous deterioration in executive management. Multiple high ranking executives have circulated in and out of the Company over the last several years, including two Chief Financial Officers ("CFOs") and a Chief Executive Officer ("CEO"), who all abruptly departed during the Class Period.  The Company has a history of violating simple and obvious accounting rules and for having weak internal controls over financial reporting, and these serious problems have not been addressed despite false assurances made to investors regarding the success of a remediation plan.

4.       During the Class Period, Defendants repeatedly misled investors to believe that a change in accounting rules for calculating revenues was the principal cause of a decline in the Company's revenues.  However, Defendants recklessly misapplied simple and obvious

accounting rules because they falsely attributed the decline in revenues to the adoption of a new rule, and failed to properly assess or account for the amount for accounts receivables that they knew were several years old and could not be collected.  This was done within months after the Company repeatedly acknowledged that it had evaluated the new accounting rule, and determined that the adoption of the new rule would not have an impact on the Company's financial results.

5.      The new rule on revenue recognition—known as Accounting Standards Codification ("ASC") 606—applies to transactions that occur after January 1, 2018, and it has nothing to do with how the balance of accounts receivables from years before that date should be treated under Generally Accepted Accounting Principles ("GAAP").  GAAP still requires a company to write down the balance of accounts receivables and increase an allowance for doubtful accounts or bad debt expenses when it determines that collectability is not probable.

6.      Rather than recklessly and incorrectly blame a change in accounting rules for the decline in revenues, Defendants should have both acknowledged that they had not properly accounted for revenue-generating transactions in the past, and written off uncollectable amounts from their balance of accounts receivables by increasing an allowance for doubtful accounts or recording bad debt expenses.  Indeed, multiple CWs confirm that the Company's receivables emanated from transactions that were several years old, and the accounts became uncollectible exclusively because insurers denied insurance claims or otherwise questioned the Company's billing practices.  A CW responsible for collecting outstanding invoices alleges that, during the Class Period, a high-level executive who is now the current CFO of the Company, decided to keep millions of dollars of uncollectible claims on the Company's balance sheet even though it was widely known that such amounts were not realizable.  Multiple CWs confirm that the

Company engaged in certain billing practices that resulted in the denial of insurance claims or otherwise made claims uncollectable, and that senior executives at the Company knew these facts.  Indeed, a CW asserts that throughout the summer of 2018, Defendant Young, the Individual Defendant who made the majority of the false and misleading statements during the Class Period, personally visited the business office several times a week to directly oversee the Company's collection effort given the increasing volume of old and/or uncollected accounts.

7.     The truth about the Defendants' actions and the financial state of Nobilis began to emerge in a series of partial disclosures that were buffeted by Defendants' additional misrepresentations.  On August 2, 2018, after the Company stated that it had reduced its revenue for the second fiscal quarter of 2018, in part, due to millions of dollars in uncollectable accounts receivables, Nobilis's share price fell $0.20 per share, more than 17%, to close at $0.95 per share on August 2, 2018.

8.     On November 9, 2018, the Company partially disclosed that it was "re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable, primarily on out of network claims greater than 365 days old."  The Company also sought additional time to file its Form 10-Q for the period ended September 30, 2018 while the Company allegedly completed its review of the financial statements.

9.     On this news, the Company's share price fell $0.18 per share, more than 25%, to close at $0.52 per share on November 12, 2018.

10.     On November 15, 2018, the Company announced that it had received notice from the New York Stock Exchange ("NYSE") that it was not in compliance with the NYSE's continued listing requirements due to its failure to timely file its Form 10-Q.

11.     On this news, the Company's share price fell $0.07 per share, more than 12%, to close at $0.48 per share on November 16, 2018.

12.     On April 11, 2019, the Company issued a press release and announced that it had formally requested the NYSE to extend the Company's deadline for filing its third quarter 2018 financial results by another six additional months.  The Company also disclosed that it "received notice from its auditors that they will not complete their audit in time to cure the Filing Delinquency during the NYSE's initial six-month cure period."

13.     On this news, the Company's stock price fell $0.018 per share, more than 6%, to close at $0.272 per share on April 12, 2019.  To date, Defendants have not made any publicly disclosed attempt to correct their materially false and misleading financial statements or otherwise come clean with investors.

14.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities upon the disclosure or materialization of the risks thereof, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Many of the acts and conduct that constitute the violations of

law complained of herein occurred in this District.  The Company maintains its headquarters in Houston, Texas, which is situated within this District.  In addition, Defendants Fleming and Klein reside in this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.     Lead Plaintiff acquired the Company's securities at artificially inflated prices during the Class Period and was damaged as a result of the federal securities law violations alleged herein.

20.     Defendant Nobilis is incorporated under the laws of British Columbia with its principal place of business located in Houston, Texas.  Nobilis's common stock trades on the American NYSE under the symbol "HLTH."

21.     Defendant Fleming is the current Chairman of the Company's Board of Directors. Fleming served as the CEO of the Company from January 2016 to December 2018.  On December 27, 2018, the Company announced that James Springfield ("Springfield") would replace Fleming as the Company's new CEO.  Fleming previously served as the Company's President from June 2014 to May 2015, and CFO of Northstar Healthcare Inc. ("Northstar"), the predecessor to Nobilis, from January 2013 to June 2014.

22.     Defendant Young served as the CFO of the Company from February 2017 to October 1, 2018.  He now serves as the CFO of Redmond and Greer Pharmacy Supply in Dallas, Texas.

23.     Defendant Klein was appointed as the Company's Interim CFO on October 1, 2018 and served in that capacity until he resigned in January 2019.  On January 17, 2019, the Company announced that it had named Brandon Moreno ("Moreno"), the then Senior Vice President of Finance at Nobilis, as the Company's new CFO.  Klein previously served as the Company's CFO from April 2015 to March 2017, and the CFO of Northstar from January 2007 to July 2010.  From March 2017 to September 2018, Klein was the Company's CFO of Operations.  In that capacity, Klein oversaw all operations at the Company, and he was responsible for increasing operational efficiencies, cutting costs, and driving margin improvements across the entire Company.

24.     The Defendants referenced above in ¶¶ 21-23 are sometimes referred to herein collectively as the "Individual Defendants."

25.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Company Background

26.     Nobilis is a full-service healthcare development and management company, with more than 30 locations across Texas and Arizona, including hospitals, ambulatory surgery centers, and multi-specialty clinics. In addition, the Company partners with more than 30 facilities across the country.  Marketing nine independent brands, Nobilis also purports to deploy a unique patient acquisition strategy driven by proprietary, direct-to-consumer marketing technology that focuses on a specified set of procedures that are performed at its facilities by local physicians.

27.     In its 2015 Annual Report, filed on March 15, 2016, Nobilis conceded that it did not employ personnel with the requisite knowledge, experience or training in the application of GAAP rules.  The Company also conceded that it did not apply the appropriate level of review, oversight and segregation of duties to the accounting and financial reporting functions or have entity level controls relevant to financial reporting objectives.

28.     The 2015 Annual Report, however, assured investors that these serious and material weaknesses in internal controls over financial reporting were remediated by appointing Klein as CFO, a Defendant here, and hiring personnel experienced and knowledgeable in the application of GAAP rules as well as implementing robust supervision over the preparation of the Company's financial statements.

29.     Although these earlier experiences put Defendants on notice of risks they took in violating GAAP and allowing material weaknesses in their internal controls over financial reporting, they again violated simple and obvious accounting rules throughout the Class Period, falsely blamed a change in accounting rules as the cause of the Company's long standing

financial problems, and refused to write-down the balance of the Company's accounts receivables or record bad debt expenses associated with accounts that became uncollectable exclusively due to their own improper billing and accounting practices.

**GAAP Standards for Revenues, Accounts Receivables, and Bad Debt Expenses**

30.     GAAP are accounting principles recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practices at a particular time against which financial presentation should be measured.  The SEC requires that public companies present financial statements in accordance with GAAP.  SEC Regulation S-X states that financial statements filed with the SEC that are not prepared and presented in accordance with GAAP are presumed to be misleading or inaccurate.

31.     The conceptual framework for financial accounting and reporting rules is set forth in the Statement of Financial Accounting Concepts ("FASCON") promulgated by the Financial Accounting Standards Board ("FASB").  FASCON 6 describes the "matching principle" of accounting that is otherwise referred to as "accrual accounting."  At the core, pursuant to FASCON 6, "matching of costs and revenues is simultaneous or combined recognition of the revenues and expenses that result directly and jointly from the same transactions or other events. In most entities, some transactions or events result simultaneously in both a revenue and one or more expenses.  The revenue and expense(s) are directly related to each other and require recognition at the same time."  *See* FASCON 6, ¶ 146.

32.     Under ASC 985 (hereafter "legacy U.S. GAAP"), revenue is recognized if (a) persuasive evidence of an arrangement exists, (b) delivery has occurred, (c) the vendor's fee is fixed or determinable, and (d) collectability is probable.

33.     By no later than January 1, 2018, public companies were required to adopt a new revenue standard promulgated by the FASB known as ASC 606.  Under ASC 606, more specific criteria must be met for an entity to recognize revenue, including the following five principles: (a) identify the contract(s) with a customer, (b) identify the performance obligation in the contract, (c) determine the transaction price, (d) allocate the transaction price to the performance obligations in the contract, and (e) recognize the revenue when (or as) the entity satisfies a performance obligation.  *See* ASC 606-10-05-04.  Notably, this new standard applies only to the recording of revenue transactions that occurred beginning on January 1, 2018 and thereafter. Critically, ASC 606 does not alter legacy U.S. GAAP's fundamental principle that amounts that are later determined to be uncollectable result in the recording of an allowance for doubtful accounts or "bad debt expenses" in the period in which such determination is made.  Accounting for these "bad debt expenses" that arise from uncollectible accounts from prior periods has no impact on the amount of revenue previously recorded on a particular transaction or on wholly unrelated revenue transactions in the then-present period.

34.     Nobilis, in fact, recognized this basic truth in its 2017 Form 10-K filed on March 12, 2018.  In the 2017 Form 10-K, the Company explicitly stated that it had "completed our evaluation of the new revenue standard and has adopted and elected the modified retrospective method of ASC 606 in the first quarter of 2018.  The adoption of this standard will require the Company to expand its current revenue disclosures, ***however, will not have a material impact on financial results.***"  (emphasis added).

35.     On May 8, 2018, the Company again reiterated this point in its quarterly report filed on Form 10-Q for the first quarter of 2018.  In the Q1 Form 10-Q, Nobilis communicated the following to investors regarding the adoption of the new revenue standard: "[we] did not

identify any changes to the recognition of revenue under ASC 606 as compared to legacy U.S. GAAP, [and] the Company had no adjustment to record as of the date of the initial application." The Company further affirmed that "[w]e do not expect the adoption of the new revenue standard to have a material impact to our net income on an ongoing basis."

36.     Critically, the accounting treatment for accounts receivables is virtually identical under legacy U.S. GAAP and ASC 606.  Under both standards, companies utilize accrual-based accounting to record accounts receivables in connection with sales transactions and maintain them on their books and records until the amount is either (a) received in the form of cash or (b) deemed to be uncollectible.

37.     Pursuant to ASC 310, companies are required to record a reserve for an allowance of doubtful accounts to account for amounts that the company believes are probable to be uncollectable.  GAAP further requires that accounts receivables should be measured periodically to ensure that the amounts at which they are being carried on the Company's balance sheet are commensurate with and reflective of the extent to which such receivables are expected to be collected.  In other words, companies are required, pursuant to GAAP, to measure and account for loss contingencies such as uncollectable accounts receivables.

38.     ASC 310 specifically requires a company to adjust the balance of receivables, including any expected losses that arise from such receivables when the following conditions are met: (a) information available before the financial statements are issued or are available to be issued . . . indicates that it is probable that an asset has been impaired at the date of the financial statements, and (b) the amount of the loss can be reasonably estimated.  Pursuant to ASC 310, a company like Nobilis, which carries significant assets in the form of accounts receivables, is required to regularly and methodologically assess the collectability of its receivables during each

reporting period.  ASC 310-10-35-41 specifically prescribes that an entity must record expected (*i.e.* probable) losses in the form of an allowance when the entity becomes aware that it is probable the balance is no longer collectible.  This rule has not changed despite the adoption of ASC 606.

39.     In fact, pursuant to ASC 606-10-55-108, if a customer fails to make payments, the company may "account for any impairment of the existing receivable in accordance with [ASC] 310 on receivables."   At a public meeting held on January 26, 2015, the FASB's staff emphatically stated that "[t]he new standard [ASC 606] does not change the accounting for receivables.  An entity accounts for a receivable in accordance with [ASC 310]."  In addition, in an article entitled "Collectability, A Revenue Recognition Condition," from February 2016, the publication *Today's CPA* reiterated that later assessments regarding the uncollectibility of outstanding receivables means that a company should write them off as bad debt expenses, which affirms the fact that the treatment of receivables later deemed to be uncollectible is the same under ASC 606.

40.     The changes brought by ASC 606 require that all revenue transactions that occur on or after January 1, 2018 must, at the time of recording, account for whether the amounts will be fully collectable based on historical experience or the present conditions, and accordingly reduce amounts that cannot be collected.  However, this does not impact revenue recorded before January 1, 2018.  Nor did Nobilis record any adjustments pursuant to ASC 606 or expect a material impact from the change in accounting rules in early 2018.

41.     On August 2, 2018, Nobilis held a conference call with analysts to discuss its financial results.   Fleming and Young participated in this conference call.   During this conference call, Young told investors that all accounts receivable adjustments under ASC 606

are now treated as reductions to current revenue unless they are specifically credit-related. Young's false statements contradict basic matching and accrual-based accounting principles explained above.  ASC 606 has no effect on pre-existing balances for accounts receivables.

42.     The new revenue standard, which applies to transactions that occur on or after January 1, 2018, requires revenue to be recorded at the amount that customers are expected to pay, *i.e.*, net of any expected differences between the gross contract price and the amount the entity expects the customer to actually pay for the goods or services.  Under legacy U.S. GAAP, a company could simply recognize revenue at its gross amount.  In other words, ASC 606 may result in a different amount recognized for revenues compared to prior periods because gross amounts are no longer utilized, but the new accounting standard has zero effect on the accounting for accounts receivables here.

43.     Any decision to write down accounts receivables that existed as of January 1, 2018—when the Company adopted ASC 606—does not result in a decrease in revenue under either ASC 606 or legacy U.S. GAAP.  Similarly, revenues that should not have been recorded under legacy U.S. GAAP because they were not realizable would reduce revenues in prior periods, and if revenues had been improperly inflated under legacy U.S. GAAP because of collectability problems, Nobilis should have acknowledged this fact and told investors that the adoption of ASC 606 *would* have an impact on reported revenues.  Nobilis, however, repeatedly told investors that ASC 606 would have no impact on its financial statements in early 2018.

44.     Regardless of a change in standards for the recognition of revenues for transactions that occur after January 1, 2018, pursuant to ASC 310, write-downs or write-offs of accounts receivables due to uncollectability increase the allowance for doubtful accounts or directly increase bad debt expenses.  This is especially true given that multiple CWs confirm that

the Company's receivables were from transactions that were several years old, and the accounts became uncollectable exclusively because of the Company's own business practices, and had nothing to do with the change in revenue recognition rules.

45.     Indeed, on January 2, 2019, Nobilis's new CEO, Jim Springfield, tacitly acknowledged that the Company and the Individual Defendants made false statements when he admitted that Nobilis's auditors were "addressing the amount and time periods" with respect to the Company's accounts receivables, and "***working to determine the ultimate amount of this reserve and the applicable period to which they would be applied***."   (Emphasis added). Springfield's decision to refer to the term of art, "reserve," is an implicit acknowledgement that any adjustments to accounts receivables does not—and should not, according to GAAP—result in subsequent adjustments to reported revenue.

**Confidential Witness Accounts Confirm the Falsity of Defendants' Class Period Statements**

46.     Confidential Witness 1 ("CW1") is a former Collections Supervisor, who worked at Nobilis from March 2016 to August 2018.  CW1 was a member of an eight-person team responsible for collecting outstanding amounts for Nobilis's out-of-network accounts receivables.  CW1's team handled the billing for all of Nobilis's outstanding accounts except for the Memorial Hermann Health System, which was an in-network hospital based in Houston, Texas.   According to CW1, in June 2018, senior managers at Nobilis pressured CW1's collections team to recover on claims that were several years old at an impossible rate.  CW1 stated that many claims that Nobilis sought to collect had been denied by the insurance companies, and they were not appealable.  CW1's team urged senior managers to write off these claims as uncollectible, but senior managers made the decision to keep the uncollectible claims on the Company's books.

47.     According to CW1, Moreno, then Senior Vice President of Finance and the current CFO of the Company, decided to "put back millions that we had told them was not realizable income."  CW1 asserts that Diana Dooley, the Director of Patient Financial Services, and Dooley's Supervisor, Suman Smith ("Smith"), a Senior Director of the Company, knew that a significant amount of claims were not realizable.  CW1 stated that a significant number of these claims were from 2016.  CW1 explained that Moreno had the authority to make adjustments to the Company's accounts receivables, but Moreno refused to do so despite knowing that millions of dollars in uncollected claims were required to be written off.

48.     CW1 stated that one of the reasons why Nobilis encountered difficulty in collecting unpaid bills was because the Company frequently engaged in "split billing" practices.  According to CW1, Nobilis's sales representatives convinced physicians to offer patients additional procedures that were unrelated to the initial reason for their visit.  For example, CW1 explained that if a patient came in to be operated for a hiatal hernia, the physician would offer a breast augmentation surgery to the patient as well, which allowed Nobilis to bill the insurer for two separate claims.  CW1 described this practice as fairly common at Nobilis.  CW1 also stated that Nobilis crafted a work around the requirement for spinal surgeries to be performed at an in-network facility by admitting patients in the emergency room at out-of-network hospitals.  According to CW1, this practice as well as split billing ultimately resulted in the denial of insurance claims, which made it difficult for Nobilis to collect on invoices.

49.     Moreover, according to CW1, "a lot of the nurses and people with licenses to lose left over time because of the compliance issues, and if something happens to patients, well, you've gotten authorization for the medical part, but not for the second part – the second part is not authorized.  If that results in a complication, then you've got a problem."

50.     The practices described by CW1 are explicitly precluded from revenue recognition under ASC 606 as well as legacy U.S. GAAP for accounts known to not be collectable, and would require the Company to write down its revenues from prior periods as well.

51.     Confidential Witness 2 ("CW2") was a collections specialist in CW1's eight-person collections team, who worked at Nobilis from December 2017 to April 2018.   CW2 directly reported to Smith.  CW2 was responsible for collecting on bills that had been previously denied by insurers. CW2 corroborated CW1's account regarding split billing, and explained that a significant number of claims were denied because Nobilis billed for procedures unrelated to the initial approved operation.   CW2 affirmed that insurers ceased to pay for the additional operations that Nobilis's partner physicians encouraged patients to receive, and the insurers paid only for the operation that had been initially approved for payment.

52.     According to CW2, Smith directed the collections team to seek payments for bills that were invoiced between 2011 and 2014, and some of the past invoices were even from more than a decade ago.  Smith specifically directed CW2 to resubmit bills for denied claims from 2005-2007. CW2 alleges that Smith submitted fictitious prices for procedures, and the insurers ultimately denied a significant number of claims related to these invoices as well.  According to CW2, Nobilis had, at least, $5 million in questionable, dated claims that the Company knew it could not ultimately collect.   In fact, CW2 explained further that hundreds of thousands of dollars were eventually clawed back by insurers following an investigation into Nobilis's billing practices.  These allegations further show that even the Company's previously recorded revenue pursuant to legacy U.S. GAAP was overstated.

53.     Confidential Witness 3 ("CW3") was a financial clearance specialist at Nobilis from April 2017 to July 2018.  As a financial clearance specialist, CW3 was responsible for communicating with patients regarding the reimbursement process related to out-of-network fees for hospital services.  CW3 also calculated payment discounts in accordance with hospital policies, obtained authorizations and pre-certifications on scheduled procedures, and attempted to secure reimbursement for each case.  CW3 was also responsible for handling communications between Nobilis and its partner physicians.

54.     CW3 confirmed that Nobilis sought to collect on a backlog of outstanding claims in early 2018.  CW3 stated that nearly half of these outstanding claims were attributable to claims that were denied due to the Company's split billing policy, which again shows that the Company improperly recognized revenue for prior periods and failed to properly reserve for uncollectible receivables.  CW3 further stated that a significant number of claims involved denials that Nobilis failed to appeal.  According to CW3, some collections specialists submitted false information into the system stating that a follow-up for denied claims had occurred when in fact no appeal had been filed.  CW3 corroborated the accounts of CW1 and CW2, and affirmed that most of the uncollected invoices dated back to, at least, 2016.

55.     According to CW3, when Nobilis intensified its effort to collect on unpaid bills from several years ago, Young came to the business office several times a week between February 2018 and July 2018 to oversee the Company's collection effort.

**Materially False and Misleading Statements and Partial Disclosures**

56.     The Class Period begins on May 8, 2018.  On that day, the Company issued a press release to announce its first quarter 2018 financial results.  It reported revenue of $64.5 million and accounts receivables as $133.4 million. The Company also provided full year 2018

guidance with revenue in the range of $345.0 million to $355.0 million and adjusted EBITDA in the range of $57.0 million to $62.0 million.   The Company also held a conference call to announce financial results, which was attended by Fleming and Young.   On the May 8, 2018 conference call, Young made the following materially false and misleading statements in response to a specific question from an analyst regarding the Company's accounts receivables.

> **<Q - Bob Gibson>:** Can I just get a little color – sorry – on your balance sheet and where you sort of see accounts receivable going as you get more and more in-network business?

> **<A - David Young>:** Bob, this is David. As we continue on the in-network side, that number is going to continue to come down. As you know, the move from Q4 to Q1 typically hasn't increased. So, that's not terribly surprising to us.   We obviously have got some work to do there, as you're aware, but we do expect to see meaningful improvement here throughout the balance of the year. I don't have a specific number for you at this point. What I'm going to do is, as we finish out here Q2, we've got some initiatives in place that we see already beginning and make a difference. So, I think, in Q2, I'll probably give you guys an update on where I think we'll finish the year on DSOs. But we do expect to see improvement obviously throughout the year.

57.    The statements identified in paragraph 56 were materially false and misleading when made because Nobilis (a) retained millions of dollars in accounts receivables on its balance sheet that were several years old, (b) refused to properly apply basic GAAP principles and increase an allowance for doubtful accounts or bad debt expenses for uncollectable receivables, and (c) omitted to disclose that millions of dollars in accounts receivables became uncollectible because insurers denied claims or otherwise questioned Nobilis's billing practices.

58.    On the May 8, 2018 conference call, Young was also specifically asked by an analyst what percentage of outstanding receivables the Company expected to collect, and Young made the following materially false and misleading statements in response:

> **<Q - Blake Corbet>:** Hey, guys. I just wanted a quick confirmation. David, you'd mentioned that DSOs outstanding, I just wondered if you could repeat the

numbers and also just deliver – and explain, if you could, how – what percentage of those receivables you expect to collect?

**<A - David Young>:** Yeah. I mean, we collect – oh, I see – we expect to collect everything that's on the balance sheet we expect to collect.

**<Q - Blake Corbet>:** So, 100%?

**<A - David Young>:** Yes.

**<Q - Blake Corbet>:** 100%.

**<A - David Young>:** Yeah, yeah.

59.     The statements identified in paragraph 58 were materially false and misleading when made because Defendants knew that (a) a significant number of accounts from several years ago were based on denied insurance claims or were otherwise uncollectible, (b) then Senior-Vice President of Finance and current CFO, Moreno, refused to write down the balance of accounts receivables and increase an allowance for doubtful accounts or bad debt expenses in violation of GAAP, and (c) millions of dollars in accounts receivables became uncollectible because insurers denied claims or otherwise questioned Nobilis's billing practices.

60.     On August 2, 2018, the Company issued a press release to announce its financial results for the second quarter of 2018 that ended on June 30, 2018.  In this press release, the Company reported that total revenues for the second quarter of 2018 were $69.2 million or a $13.5% decrease over the same prior year period.  The Company falsely attributed the decrease in revenue as "largely driven by the impact of the implementation of ASC 606 and the loss of the [C]ompany's Lab Testing and ancillary business."  The Company revised its full year guidance for revenues down to a range of $315 million to $330 million, and made the following additional materially false and misleading statements:

> The decrease in total revenue during the first six months of 2018 was driven by the same factors influencing the revenue shortfall experienced in the second

quarter, which was the discontinuation of the Lab Testing business and the impact of the change in accounting guidance.  Lab Testing represented approximately $13.8 million dollars of revenue in the first six months of 2017 which did not re-occur in 2018, and the full year impact of the change in accounting is $6.8 million.

61.     On this news of the partial disclosure or materialization of the risk of a deterioration in accounts receivables, the Company's share price fell $0.20 per share, more than 17%, to close at $0.95 per share on August 2, 2018.

62.     However, regardless of this partial disclosure, the statements identified in paragraph 60 were materially false and misleading when made because (a) the change in accounting rules and the adoption of ASC 606 has no effect on the treatment of accounts receivables, (b) the Company improperly deducted millions of dollars in accounts receivables that were several years old from current revenues, and (c) the Company continued to violate GAAP by refusing to write down the balance of accounts receivables and increase an allowance for doubtful accounts or bad debt expenses for claims that were widely known to be uncollectible.

63.     On August 2, 2018, the Company also held a conference call with analysts to discuss its financial results.  Fleming and Young participated in this conference call, in which Young specifically made the following materially false and misleading statements:

> ***Revenues from patient and net professional fees were down $12.6 million year-over-year, largely driven by the impact of the implementation of ASC 606 and the discontinuation of the lab business.***
>
> **\*\*\*\***
>
> ***With the implementation of ASC 606, we now record all AR adjustments as reductions in revenue, unless they are specifically credit-related.***  In the second quarter, we recorded $5.8 million related to this new guidance, $3.4 million of this amount related to a write-down of our lab revenues and the balance related to the write-off of over accounts receivable balances.  Under the old accounting rules, these adjustments would have been recorded as bad debt expense.

. . .  Revenue per case was $11,086, a 36.3% decline over last year as the addition of new in-network volumes from Elite; the elimination of lab testing revenues, which added top line revenues without adding case volume; ***and the impact of the new accounting pronouncement led to a lower overall revenue per case figure.***

****

The primary contributor in the shortfall in year-over-year revenue was a $15 million decrease in patient and net professional fees. ***This was driven by the same factors as we saw in Q2, the discontinuation of the lab business and the impact of the change in accounting. Lab revenues in the first half of 2017 were $13.8 million, and the 2018 full year impact of the change in accounting is $6.8 million.***

64.     The statements identified in paragraph 63 were materially false and misleading when made because (a) the implementation of ASC 606 has no effect on the accounting for accounts receivables, (b) the Company violated GAAP by improperly subtracting millions of dollars in uncollectable receivables from current revenues, and (c) the Company violated GAAP because it failed to write down the balance of accounts receivables and increase an allowance for doubtful accounts or bad debt expenses for claims that were widely known to be uncollectible.

65.     On the August 2, 2018 conference call, Young also made the following materially false and misleading statements regarding the Company's accounts receivables:

**<Q - Neal I. Goldman>:** Okay. The receivable amount today is how much?

**<A - David Young>:** $144 million, $143.5 million.

**<Q - Neal I. Goldman>:** And what would be your expectation in terms of reduction in the second half?

**<A - David Young>:** We're talking about a $20 million reduction here in the second half. That's what we're targeting.

**<Q - Neal I. Goldman>:** Okay. [indiscernible] (00:28:24) in place to achieve that or where is that coming from?

**<A - David Young>:** I do think we have. We got some new leadership there. We're working with some third parties who are specialists in out-of-network

collections and focusing on processes. So we feel good about the results we're starting to see. Yeah. We're already starting to see improvement there.

**<Q - Neal I. Goldman>:** Okay. So that would be a significant change in the fourth quarter also.

<**A - David Young**>: It would be. Yeah.

66.    The statements identified in paragraph 65 were materially false and misleading when made because, based on the testimony of multiple CWs, Defendants (a) failed to write down the balance of accounts receivables and increase an allowance for doubtful accounts or bad debt expenses for claims that were widely known to be uncollectible, (b) incorrectly blamed a change in accounting rules and made improper adjustments to current revenues to cover up their own improper business and accounting practices, and (c) knew that millions of dollars in accounts receivables from several years ago were uncollectible because insurers denied claims or otherwise questioned the Company's billing practices.

67.    On August 3, 2018, Nobilis filed, on SEC Form 10-Q, its quarterly financial report for the second quarter of 2018 that ended on June 30, 2018.  The second quarter 10-Q contained the following materially false and misleading statements regarding the Company's revenue recognition practices:

Revenue Recognition

Effective January 1, 2018, we adopted Accounting Standards Updates (ASU) 2014-09, *Revenue from Contracts with Customers* (ASC 606, "new revenue standard") and a series of related ASU's designed to create improved revenue recognition and disclosures to all contracts that were not completed, using the modified retrospective method.

Under the modified retrospective method, the cumulative effect of initially applying the new revenue standard is recorded as an adjustment to the opening balance of retained earnings on the date of initial application; prior periods are not restated.  The Company did not identify any changes to the recognition of revenue under ASC 606 as compared to legacy U.S. GAAP.  ***However adoption of the new standard also resulted in changes with regard to the presentation of***

*revenues and the provision for uncollectible accounts. Upon adoption, any estimation of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating revenues, with a corresponding reduction in the amounts presented separately as bad debt expense.*

68.     The statements identified in paragraph 67 were materially false and misleading when made because (a) the change in accounting rules and the adoption of ASC 606 has no effect on the calculation of accounts receivables, (b) the Company improperly deducted millions of dollars in accounts receivables that were several years old from current revenues, and (c) the Company violated GAAP because it failed to write down the balance of accounts receivables and increase an allowance for doubtful accounts or bad debt expenses for claims that were widely known to be uncollectible.

69.     The second quarter 10-Q also contained the following materially false and misleading statements regarding the Company's internal controls over financial reporting:

**Item 4. Controls and Procedures**

**<u>Evaluation of Disclosure Controls and Procedures</u>**

Under the supervision and with the participation of the Company's management, including the Chief Executive Officer ("CEO"), the principal executive officer, and Chief Financial Officer ("CFO"), the principal financial officer, the Company's management conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures, as such term is defined under Rules 13(a)-15(e) and 15(d)-15(e) promulgated under the Securities Exchange Act of 1934, as amended.  *Based on this evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures were effective during the six months ended June 30, 2018, except for the material weaknesses previously identified in Part II, Item 9A-Controls and Procedures of our Annual Report on Form 10-K for the year ended December 31, 2017 as filed with the SEC on March 12, 2018.*

**Remediation Initiatives**

We are currently in the process of implementing our remediation plans. To date, we have implemented and are continuing to implement a number of measures to address the material weaknesses identified. The remediation plan includes the following:

- We are implementing enhanced internal controls and improving the communication and coordination among our third-party billing and collection agencies, finance department and our record-keeping procedures and we have expanded cross-functional involvement and input into monthly reviews of outstanding and aged trade accounts receivable due to the Company.

- We are in the process of assessing the allowance for doubtful accounts process and methodology including documenting additional procedures; which includes those designed to add depth to our review procedures.

- Implementing specific review procedures, including the added involvement of third-party specialists in the review of significant, complex and non-recurring transactions designed to enhance our financial reporting and month end close processes; and

- Strengthening our financial reporting process with improved documentation standards, technical oversight and training related to third-party valuations and acquisition accounting.

**<u>Changes in Internal Control Over Financial Reporting</u>**

***Except as discussed immediately above in the Remediation Initiatives there has been no change in the Company's internal control over financial reporting during the three and six months ended June 30, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.***

70.     The statements identified in paragraph 69 were materially false and misleading when made because the Company's internal control over financial reporting had material weaknesses beyond those identified in its Annual Report for 2017, including (a) the failure to follow simple and obvious GAAP principles, (b) the refusal of senior managers at the Company, including the Company's current CFO, to write off millions of dollars in uncollectable amounts and increase an allowance for doubtful accounts or bad debt expenses for claims that were widely known to be uncollectible throughout the Class Period, and (c) the failure of the Company's purported remediation steps to prevent ongoing GAAP violations or otherwise come clean with investors regarding the source of the Company's financial troubles.

71.     On November 9, 2018, the Company issued a press release, and announced that it filed a Form 12b-25 Notification of Late Filing with the SEC relating to its 10-Q for the period ended September 30, 2018, stating in relevant part:

> In the filing, the Company stated that additional time is required for the Company and the auditor to complete their review of the Company's financial statements in order to finalize the 10-Q. ***The Company is re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable, primarily on out of network claims greater than 365 days old***. The final adjustment is subject to the completion of the Company and the auditor's review.
>
> ****
>
> This 12b-25 filing gives the company an additional 5 days to file its 10-Q and still be deemed to have been a timely filer. The company is working diligently with our auditors to complete the review of our financial statements.

(Emphasis added.)

72.     On this news of the partial disclosure or materialization of the risk of extending the filing of the Form 10-Q due to problems with accounts receivables, the Company's share price fell $0.18 per share, more than 25%, to close at $0.52 per share on November 12, 2018.

73.     In the November 9, 2018 press release, Klein made the following materially false and misleading statements:

> We are deeply disappointed by the slow pace of our collection efforts that have resulted in this impact to our receivables, which will have a significant negative impact on our financial results for 2018.  ***Over the last several months we have completely overhauled the process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables.***

74.     The statements identified in paragraph 73 were materially false and misleading when made because, as recounted by multiple CWs, the Company did not improve its collection processes and procedures during the Class Period and, instead, continued to retain known uncollectable amounts in accounts receivables on its balance sheet.  The statements identified in

paragraph 73 were also materially misleading because Klein failed to correct the Company's previous false statements regarding the adoption of ASC 606 as the cause of its missed revenue guidance, and failed to inform investors that GAAP required the Company to write off millions of dollars in uncollectable amounts and increase an allowance for doubtful accounts or bad debt expenses for claims that were widely known to be uncollectible throughout the Class Period.  As the former CFO of Nobilis and then CFO of Operations responsible for increasing operational efficiencies, cutting costs, and driving margin improvements across the entire Company, Klein knew or recklessly disregarded that the Company violated simple and obvious accounting rules throughout the Class Period yet chose to withhold material facts from investors regarding the improper revenue recognition practices utilized by the Company or the existence of millions of dollars in uncollectable accounts receivables.

75.     On November 15, 2018, the Company issued a press release, and announced that it had received notice from the NYSE that the Company was not in compliance with the NYSE's continued listing requirements due to its failure to timely file its quarterly report for the third quarter of 2018.

76.     On this news of the partial disclosure or materialization of the risk of notice of non-compliance with continued listing requirements, the Company's share price fell $0.07 per share, more than 12%, to close at $0.48 per share on November 16, 2018, on heavy trading volume.

77.     On December 27, 2018, Nobilis announced that Springfield would replace Fleming as the Company's CEO.

78.     On January 2, 2019, Fleming and Springfield held a conference call with investors to announce Springfield's appointment as the new CEO of the Company.  In this conference call,

Springfield stated that the Company was working with its auditors to address the amounts and time periods associated with the reserves relative to Nobilis's out-of-network receivables. Specifically, Springfield represented that "***our audit firm is working to determine the ultimate amount of this reserve and the applicable periods to which they would be applied***." (Emphasis added). Springfield and Fleming, however, did not correct the Company's prior false statements that attributed the decline in revenue to a change in accounting rules or the purported need to deduct accounts receivables from current revenue or tell investors the truth regarding the systemic problems associated with receivables or disclose that the Company would be required to adjust the carrying amounts of its accounts receivables for uncollectable amounts, including the recognition of bad debt expenses.

79.     On January 17, 2019, the Company issued a press release to announce that Moreno would replace Klein as the Company's new CFO. The Company did not provide an explanation for Klein's abrupt departure or otherwise explain why he was replaced within months of being appointed to replace another CFO.

80.     On April 11, 2019, the Company issued a press release, and announced that it had formally requested the NYSE to extend the Company's deadline for filing its third quarter 2018 financial results by another six additional months. In this press release, the Company stated that it "received notice from its auditors that they will not complete their audit in time to cure the Filing Delinquency during the NYSE's initial six-month cure period." Nobilis further stated in this press release that "[w]e cannot assure you that the NYSE will grant an extension or that we will be able to resolve our Filing Delinquency within any extended cure period."

81.     On this news of the partial disclosure or materialization of the risk, the Company's stock price fell $0.018 per share, more than 6%, to close at $0.272 per share on April 12, 2019, on heavy trading volume.

82.     On May 10, 2019, the Company announced that Springfield had resigned as the new CEO effective May 7, 2019.  No explanation was provided for his departure.

## ADDITIONAL SCIENTER ALLEGATIONS

83.     Nobilis has 30 locations across Texas and Arizona, including hospitals, ambulatory surgery centers and multi-specialty clinics.  Medical procedures that are performed at these facilities constitute a core operation of the Company, and revenue derived from these procedures is the primary source of revenue for Nobilis.  Indeed, Smith told CW2 that Nobilis needed to collect, at least, $5 million in aged receivables to be able to sustain the Company's financial stability.

84.     In addition, each Individual Defendant knew or recklessly disregarded the fact that the Company had earlier violated simple and obvious accounting rules and was sued under the federal securities laws for such violations.  As such, the Individual Defendants were put on notice of the risk of liability for violating GAAP and the reporting requirements under the federal securities laws. In fact, Nobilis admitted such violations occurred in the 2015 Annual Report, and assured investors that the problems had been remediated.

85.     In addition, all three Individual Defendants served as the Company's CFO at some point in time, which means they were aware of what was required under GAAP and the reporting requirements under the federal securities laws.  Young served as the CFO of the Company during the Class Period, spoke at length about ASC 606 and the Company's accounts receivables, demonstrating his knowledge of GAAP requirements and the problems with the

Company's accounts receivables.  Fleming, who served as the Company's CFO prior to the Class Period and was the current CEO of the Company during the Class Period, participated in conference calls, in which Young made materially false and misleading statements, and Fleming endorsed Young's false statements with his silence.  Klein served as the Company's CFO both before and during the Class Period, and he also served as the CFO of Operations during the Class Period.  As the CFO of Operations, Klein either knew or recklessly disregarded the fact that the Company failed to collect amounts for claims that were denied due to its improper business and accounting practices, and yet he failed to correct Young's false statements when he spoke about the relevant issues as the interim CFO during the Class Period.

86.     Nobilis's second quarter report filed on Form 10-Q also contains Fleming's and Young's signed certifications under the Sarbanes Oxley Act of 2002 ("SOX").  Pursuant to the SOX certifications, Fleming and Young affirmed that the Company's financial statements fairly presented all material aspects of its financial condition and results of operations, and that the Company's disclosure controls and procedures were effective, and provided reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP.

87.     According to CW3, during the Class Period, Young personally visited the business office several times a week to directly oversee the Company's collection effort given the increasing volume of old and/or uncollected accounts, which means he knew the amount and magnitude of uncollectable accounts receivables.

## **LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

88.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired the Company's common stock during the Class Period (the "Class"); and were damaged upon the partial disclosure or materialization of the risks that stemmed from Defendants' material misrepresentations and/or omissions.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, the Company's securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

90.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

92.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

•      whether the federal securities laws were violated by Defendants' acts as alleged herein;

•      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

•      whether the Individual Defendants caused the Company to issue false and misleading statements during the Class Period;

•      whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

•      whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

•      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

94.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

•      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

•      the omissions and misrepresentations were material;

•      the Company's securities are traded in an efficient market;

•      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

• the Company traded on the NYSE and was covered by multiple analysts;

• the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

• Lead Plaintiff and members of the Class purchased, acquired and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

95. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

96. Alternatively, Lead Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

97. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

98. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

99. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to

state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of the Company's securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

100.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for the Company's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

101.    The Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or

recklessly disregarded that material facts were being misrepresented or omitted as described above.

102.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

103.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of the Company's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired the Company's securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

104.    During the Class Period, the Company's securities were traded on an active and efficient market.  Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused

to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of the Company's securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of the Company's securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of the Company's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

105.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure or materialization of the risk that the Company had been disseminating misleading statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

107.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

108.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's false and misleading statements.

109.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

110.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

111.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company.   By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

112.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.


Dated:  May 17, 2019

Respectfully submitted,

*/s/ Omar Jafri*

**POMERANTZ LLP**
Patrick V. Dahlstrom
Omar Jafri
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com
          ojafri@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          jlindenfeld@pomlaw.com

**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING PC**

Sammy Ford IV
Federal Bar Number 950682
Texas Bar Number: 24061331
1221 McKinney, Suite 2500
Houston, Texas 77010
Telephone: (713) 655-1101
Facsimile: (713) 655-0062
Email: sford@azalaw.com

*Lead Counsel for Lead Plaintiff*