**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTHERN TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **ZHANG YANG,** Individually and on Behalf of All Others Similarly Situated, | § § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | CIVIL ACTION NO. 4:19-CV-00145 |
| **NOBILIS HEALTH CORP., HARRY FLEMING, DAVID YOUNG,** and **KENNETH J. KLEIN,** | § § § § § | |
| *Defendants.* | § | |

**MEMORANDUM AND RECOMMENDATION**

This class action securities fraud case is brought against the former senior executives of Nobilis Health Corporation ("Nobilis"): Harry Fleming ("Fleming," CEO), David Young ("Young," CFO), and Kenneth Klein ("Klein," CFO).[1] Each defendant served Nobilis during part of the class period. Lead Plaintiff Zhang Yang alleges that Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 by omitting and misrepresenting material financial information to investors during a class period of May 8, 2018 to April 11, 2019.

The Court now considers Defendants' Motions to Dismiss (Document Nos. 26 & 28) and the filings made in opposition or support: Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint (Document No. 33), Defendants' Replies (Document Nos. 34 & 35), Plaintiff's Sur-Reply (Document No. 39), and the parties' Supplemental

---

[1] Nobilis itself was originally included in the suit. However, Nobilis has since declared bankruptcy. The case thus proceeds with just the individual defendants.

Briefs (Document Nos. 59 & 60). For the reasons stated and explained below, the Magistrate Judge RECOMMENDS that the motions to dismiss from each defendant be GRANTED.

## I.     Procedural History

Lead Plaintiff filed the initial Complaint on January 14, 2019 asserting claims for violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. (Document No. 1 ¶ 1). On April 2, 2019, the Court signed an Order Granting Zhang Yang's Motion for Appointment for Lead Plaintiff and Approval of Counsel. (Document No. 12). Plaintiff filed the First Amended Complaint on May 17, 2019, (Document No. 25); and Defendants timely filed their 12(b)(6) Motions to Dismiss on June 7, 2019. (Document Nos. 26-28). In Defendants' Motions to Dismiss, they argue Plaintiff has not stated a claim under federal securities law because Plaintiff has not adequately pled three elements of a § 10(b) claim: misrepresentation, scienter, and reliance. Defendants also argue that in the absence of a plausible securities fraud claim under § 10(b), there cannot be a plausible claim under § 20(a).

## II.    Standards of Review

### A. Federal Rules of Procedure: 12(b)(6) Motions to Dismiss

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is said to be plausible if the complaint contains "factual content

2

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Plausibility will not be found where the claim alleged in the complaint is based solely on legal conclusions, or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Nor will plausibility be found where the complaint "pleads facts that are merely consistent with a defendant's liability" or where the complaint is made up of "'naked assertions devoid of further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)). Plausibility, not sheer possibility or even conceivability, is required to survive a Rule 12(b)(6) motion to dismiss. *Twombly*, 550 U.S. at 556–57; *Iqbal*, 556 U.S. at 678-79.

In considering a Rule 12(b)(6) motion to dismiss, all well pleaded facts are to be taken as true, and viewed in the light most favorable to the plaintiff. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). But, as it is only facts that must be taken as true, the court may "begin by identifying the pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. It is only then that the court can view the well pleaded facts, "assume their veracity and [ ] determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. A plaintiff must support every element in each cause of action with specific factual allegations in order to meet the pleading requirements and survive a 12(b)(6) motion to dismiss. *Kan v. OneWest Bank, FSB*, 823 F. Supp. 2d 464, 468 (W.D. Tex. 2011).

## B.  Federal Securities Law: Elements of a 10(b) and 10b-5 Claim

Section 10(b) of the Securities Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary

or appropriate in the public interest or for the protection of investors." 15 U.S.C.A. § 78j(b). Rule

10b-5 makes it unlawful for any person, directly or indirectly:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a § 10(b) and Rule 10b-5 claim, a plaintiff must sufficiently allege the following

elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale of a security; (4)

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).

### C.   Federal Securities Law: Heightened Pleading Standards

In securities fraud cases, Federal Rule of Civil Procedure 9(b) and the Private Securities

Litigation Reform Act ("PSLRA") heighten a plaintiff's pleading requirements beyond what is

required under Rule 12(b)(6). The Fifth Circuit combined Rule 9(b) and PSLRA into one cohesive

rule:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b), 15 U.S.C.A. §§ 78u-4(b) (1) and 78u-4 (b) (3) (A):
>
> > (1) specify [that] each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;
> >
> > (2) identify the speaker;

(3) state when and where the statement was made;

(4) plead with particularity the contents of the false representations;

(5) plead with particularity what the person making the misrepresentation obtained thereby; and

(6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

*ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

In addition, the PSLRA further heightened the pleading standards for the scienter element.[2] *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532-33 (5th Cir. 2008). Under the PSLRA, a plaintiff must plead with particularity those facts giving rise to a "strong inference" that the defendant acted with the required state of mind under 15 U.S.C.A. § 78u-4 (b) (2). *Id.* At the pleading stage, a complaint must establish an inference of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged" to a reasonable person. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Finally, the PSLRA contains a safe harbor provision that protects individuals and corporations from liability for certain forward-looking statements that later prove to be false. To qualify for this protection, the statement at issue must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be "immaterial." 15 U.S.C.A. § 78u-5 (c)(1)(A)(i, ii). "To avoid the safe harbor, plaintiffs must plead facts demonstrating that the statement was made

---

[2] PSLRA only heightens the pleading standard for scienter, not any of the other five elements of security fraud. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir. 2009).

with actual knowledge of its falsity." *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004) (citing § 78u-5(c)(1)(B)); *see also Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 409 (5th Cir. 2001).

If the plaintiff fails to meet the pleading standards established by 12(b)(6), 9(b), or the PSLRA, the claim should be dismissed. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

## III.    Plaintiff's Allegations

### A. Element One: Material Misrepresentation or Omission

Plaintiff's claims are based in three alleged misrepresentations: (1) falsely blaming the transition to a new accounting rule for a decline in revenue; (2) misrepresenting the initiatives and improvements in the company's financial reporting and collections process; and (3) misrepresenting the company's ability to collect on its account receivables. In support of those misrepresentation claims, Plaintiff first alleges Defendants falsely blamed a change in accounting rules for the decline in Nobilis' revenues, specifically concerning revenues from unpaid account receivables. That accounting change, in Accounting Standards Codification ("ASC") 606, established how firms must recognize revenue and replaced ASC 605 ("Legacy GAAP").[3] Nobilis transitioned from Legacy GAAP to ASC 606 on January 1, 2018. According to Plaintiff,

---

[3] Plaintiff claims ASC 606 replaced ASC 985, (Amended Complaint 9-10; Plaintiff's Reply 2-3), but ASC 985 concerns revenue recognition for transactions in the *software* industry. For a general comparison of the ASC 605 and 606 standards for when public companies recognize revenue, see Josef Rashty, *Collectibility, A Revenue Recognition Condition*, Today's CPA, Jan./Feb. 2016, at 21-22.

the transition had no effect on the treatment of account receivables and did not apply to transactions that occurred before the transition date, January 1, 2018. According to Plaintiff, Nobilis should have continued to account for uncollectible account receivables by increasing its allowance for doubtful accounts or bad debt expenses. Instead, Plaintiff alleges Defendants improperly accounted for account receivables by subtracting uncollectible amounts from current revenues.

Plaintiff points to multiple statements made by Defendants that allegedly misled investors about the effect of ASC 606. (Emphasis added throughout).

- 5/8/18: Nobilis' 10-Q states, "The Company did not identify any changes to the recognition of *revenue* under ASC 606 as compared to legacy U.S. GAAP. However adoption of the new standard also resulted in changes with regard to the *presentation of revenues* and the provision for uncollectible accounts. Upon adoption, any estimation of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating *revenues*, with a corresponding reduction in the amounts presented separately as bad debt expense." (Ex. 4 at 8).

- 8/2/18: Nobilis issues a press release, saying, "The decrease in total *revenue* was largely driven by the impact of the implementation of ASC 606 and the loss of the company's Lab Testing ancillary business." (Ex. 2 at 4).

- On 8/2/18, Nobilis held a conference call. In the call, Defendant Young stated, "the impact of the new accounting pronouncement led to a lower overall *revenue* per case figure." (Ex. 3 at 4).

- 8/3/18: Nobilis' 10-Q states, "However adoption of the new standard also resulted in changes with regard to the presentation of *revenues* and the provision for uncollectible accounts. Upon adoption, any estimation of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating *revenues*, with a corresponding reduction in the amounts presented separately as bad debt expense." (Ex. 5).

- 11/9/18: Nobilis issues a press release, announcing they have notified the SEC that they will file their third quarter 10-Q late because "[Nobilis] is re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable, primarily on out of network claims greater than 365 days old." (Ex. 6).

- 11/9/18 Press Release, cont'd.: "Over the last several months we have completely overhauled the process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables." (Ex. 6).

- 1/2/19: Fleming and Springfield [the new CEO] hold a conference call in which Springfield states, "our audit firm is working to determine the ultimate amount of this reserve and the applicable periods to which they would be applied."

Plaintiff also alleges Defendants made misleading statements concerning the efficacy of Nobilis' collection and financial reporting procedures, as well as Nobilis' expectations about the collectability of its account receivables. Plaintiff points to

- 5/8/18: Nobilis holds a conference call. Young states that he expects to collect 100% of the account receivables listed on the balance sheet.

- 8/2/18: Nobilis holds a conference call. Young states that he expects a $20 million reduction in the $144 million outstanding amount in Nobilis' account receivables.

- 8/3/18: Nobilis' 10-Q states Nobilis "disclosure control and procedures were effective … except for the material weaknesses previously identified in [the 2017 10-K]."

- 11/9/18: Nobilis issues a press release that states, "We are deeply disappointed by the slow pace of our collection efforts that have resulted in this impact to our receivables, which will have a significant negative impact on our financial results for 2018. Over the last several months we have completely overhauled the [collection] process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables."

Plaintiff points to statements from confidential witnesses ("CWs") to establish the falsity of Defendants' statements about Nobilis' collection procedures and expectations of collectability.  Confidential Witness 1 ("CW1") was a former Collections Supervisor. CW1 claimed "senior managers at Nobilis pressured CW1's collections team to recover on claims that were several years old at an impossible rate." (Document No. 25 ¶ 46). CW1 stated that many claims that Nobilis sought to collect had been denied by the insurance companies, and

8

they were not appealable." *Id.* CW1 claimed Nobilis' "split billing" practices resulted in uncollectible claims because insurers would only pay for the approved procedure. *Id.* ¶ 48.

Confidential Witness 2 ("CW2") was a collections specialist. *Id.* ¶ 51. CW2 affirmed CW1's assertion that split billing resulted in uncollectible claims. *Id.* CW2 also alleged a senior director billed "fictitious prices." *Id.* ¶ 52.

Confidential Witness 3 ("CW3") was a financial clearance specialist who coordinated between patients, the hospital, and insurance companies regarding services and payments. *Id.* ¶ 53. CW3 claimed "nearly half of these outstanding claims were attributable to claims that were denied due to the Company's split billing policy." *Id.* ¶ 54.

### B. Element Two: Scienter

Plaintiff alleges Defendants knowingly or recklessly failed to write down uncollectible account receivables on Nobilis' balance sheet and concealed their past failures by improperly deducting uncollectible accounts from current revenue and falsely blaming the consequently falling revenue on ASC 606. (Document No. 25 ¶ 6; Document No. 33, at 1).

Plaintiff claims Defendants knew that ASC 606 would have no effect on account receivables because Defendants previously made representations to that effect. Namely, Plaintiff alleges the 2017 10-K filed on March 12, 2018 stated the accounting changes "will not have a material impact on *financial results.*" (Ex. 5 at 59) (emphasis added). Plaintiff says this contradicts later statements (quoted above) that blame falling *revenue* on accounting changes and ASC 606.

Plaintiff also cites to CWs' statements to establish scienter: "CW1's team urged senior managers to write off these claims as uncollectible, but senior managers made the decision to keep the uncollectible claims on the Company's books. (Document No. 25 ¶ 46). CW2 said, "Nobilis

9

had, at least, $5 million in questionable, dated claims that the Company knew it could not ultimately collect." *Id.* ¶ 52. CW3 claimed, "Young came to the business office several times a week between February 2018 and July 2018 to oversee [Nobilis'] collection effort. *Id.* ¶ 55.

Finally, Plaintiff alleges the officers' high position in the company supports an inference of scienter because it meets the "special circumstances" described in *Carlton v. Cannon*. 184 F. Supp. 3d 428, 459-60 (S.D. Tex. 2016) (establishing small company, critical transaction, readily apparent information, and inconsistent statements as four special circumstances that support an inference of scienter in rare cases). (Document No. 33, at 13).

### C.  Elements 3-6: Reliance/Loss/Causation

Plaintiff alleges that share prices dropped following Nobilis' announcement that they would submit their mandatory financial disclosures late due to their reconsidering the collectible values in their account receivables. Plaintiff also alleges the security price was therefore inflated and, had Plaintiff and the class known about the improper handling of account receivables, they would not have acquired the securities at the inflated price.

### IV.  Analysis

Defendants argue that the securities fraud claims in this case should be dismissed because Plaintiff has failed to satisfy the 12(b)(6), 9(b), and the PSLRA pleading requirements for a § 10(b) and Rule 10b-5 claim. Because § 20(a) claims are derivative of § 10(b), if the primary claim violation is dismissed the § 20(a) claims must be as well.

As set forth above, Plaintiff alleges three different misrepresentations: falsely blaming the transition to ASC 606 for the decline in revenues, misrepresenting the initiatives and

10

improvements in the company's financial reporting and collections process, and misrepresenting the company's ability to collect on its account receivables. In their Motions to Dismiss, Defendants argue 1) Defendants' statements, far from being misleading, were true and accurate, 2) Plaintiff fails to establish scienter for any Defendant, and 3) neither Plaintiff nor members of the class relied on the misleading statements because share prices did not increase after Defendants made the allegedly misleading statements.

Because much of the controversy concerns the effect ASC 606 had, or should have had, on Nobilis' accounting, a review of the relevant accounting principles is needed. ASC 606 replaced the ASC 605's standards for when to recognize revenue. Under ASC 606, which Nobilis adopted January 1, 2018, an entity must complete five steps before recognizing revenue:

Step 1: Identify the contract(s) with a customer.

Step 2: Identify each parties' performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: If there are multiple performance obligations, allocate the total transaction price among each performance obligation.

Step 5: Recognize revenue when the entity satisfies its performance obligation.

ASC 606-10-05-4.

By application, Steps 1 and 3 also change *how* an entity presents revenue: A company has to deduct what it does not expect to collect directly from revenue, instead of listing it as an allowance or bad debt expense. ASC 606-10-25-1(e) permits an entity to identify the contract (therefore reporting revenue) only if collection is *probable*. Of course, the chances of collection increase if the amount to be collected decreases. Therefore, an entity can satisfy the 606-10-25-1 criteria by

11

either recognizing an explicit price concession, or factoring in implicit price concessions. Such price concessions are determined through Step 3: "Determine the transaction price." An entity arrives at the transaction price by subtracting any price concessions from the contractual price. *See* ASC 606-10-32-2.[4] The entity then reports this transaction price directly as revenue. ASC 606-10-32-1.

Under Legacy GAAP (Generally Accepted Accounting Principles), entities could list the entire contractual price as revenue and account for what they did not expect to collect by listing it as an "allowance" or "bad debt expense." With the goal to simplify and standardize financial statements, under ASC 606, "bad debt expense will no longer be a separate line item on the face of a health care company's income statement. Instead, total revenues will already include the amount the company doesn't expect to collect from patients." *How the Revenue Recognition Standard will Affect Bad Debts in Health Care*, WEAVER (Dec. 14, 2017), https://weaver.com/blog/how-revenue-recognition-standard-will-affect-bad-debts-health-care/. In sum, the change in accounting rules under ASC 606 affected how companies report their revenue, but it did not affect their net profits because the rule only dictates *where* companies report the same uncollectible bills. A company must consider all relevant factors in determining a reasonable amount to collect,

---

[4] *See also* Dixon Hughes Goodman, LLC, *Navigating the New Healthcare Revenue Recognition Model* 3-4 (2018) ("The 'transaction price' under the new standard does not refer to gross charges based on established rates per the charge description master; rather, it is the amount the provider expects to be entitled to under the contract."). For examples of companies adjusting the transaction price to reflect what they *expect* to collect, see ASC 606-10-55-99 through 55-101; 606-10-55-102 through 55-105; and 606-10-55-208 through 55-215.

12

including historic data on collectability, current information, and forward-looking forecasts. ASC 606-10-32-9.

The reporting requirements for subsequent changes in collectability-estimates depend on the reason for the change. New information about a patient's credit (e.g., if the patient files for bankruptcy) is reported as an allowance and recorded as an expense—not as a reduction in revenue. ASC 310-10-35-41. However, for all other adjustments,[5] changes in estimates are "recognized as revenue, or as a reduction of revenue, in the period in which the transaction price changes." ASC 606-10-32-43; *see also* BKD, *Revenue Recognition: A Comprehensive Review for Health Care Entities (2018)* ("AICPA believes changes in the entity's expectation of the amount of customer payments will be recorded in revenue—unless there is a patient-specific event, e.g., a bankruptcy filing, that suggests the patient no longer has the ability and intent to pay the amount due and, therefore, the changes in estimate better represent an impairment (bad debt).").

---

[5] "Contractual adjustments and discounts are variable consideration and shall be measured in accordance with paragraphs 606-10-32-5 through 32-14 (e.g. as revenue)." ASC 954-310-30-1 (alteration added). Contractual adjustments and discounts include consideration conditioned on inspection, ASC 606-10-55-194 though 55-197, timing, 55-198 through 55-200, and volume, 55-216 though 55-220. In general, "variable consideration is anything that causes the consideration to vary. For health care entities, this includes contractual allowances, discounts, concessions and contingent payments. Pricing also varies depending on the party financially responsible for payment—patient, private insurer, Medicare, etc." *Revenue Recognition: A Comprehensive Review for Health Care Entities (2018)*.

A. Plaintiff has not Plausibly Alleged an Actionable Misrepresentation

   1.  Statements Related to Transition to ASC 606

Defendants' statements about ASC 606 do not constitute actionable misrepresentations.  First, Plaintiff misstates the effect and governing rules of ASC 606. Plaintiff cites to statements made by Defendants on August 2, 2018 and August 3, 2018 where Nobilis attributes the decrease in *revenue*, in part, to the change in accounting rules. Plaintiff says this is misleading because "the change in accounting rules and the adoption of ASC 606 has no effect on the calculation of accounts receivables." (Document No. 25 ¶¶ 64, 68). Plaintiff appears to confuse an effect on *revenue* with an effect on *net profits*. ASC 606 changes where uncollectible account receivables are reported. This has no effect on net profit but naturally decreases revenue by reshuffling where the bad debts are reported. Defendants accurately described the accounting change in their 10-Q form filed May 8, 2018: "Upon adoption, any estimation of uncollectable amounts that were previously considered allowance for doubtful accounts are generally considered implicit price concessions that are a direct reduction to net operating revenues, with a corresponding reduction in the amounts presented separately as bad debt expense." (Ex. 4 at 8).[6] Defendants' statements

---

[6] *See* Dixon Hughes Goodman, LLC, *Navigating the New Healthcare Revenue Recognition Model* 3-4 (2018) ("Under the new standard, such implicit price concessions are not presented separately as 'provision for uncollectible accounts' or 'bad debts,' but are direct reductions of revenue, similar to contractual adjustments. Such amounts are not part of the transaction price and thus are not recognized as revenue in the first place."). BKD, LLP also released a white paper, entitled, *Revenue Recognition: A Comprehensive Review for Health Care Entities (2018)*. The example 10-K filings in BKD's white paper for "Community Health Systems, Inc." and "Tenet Healthcare Corporation" uses language substantially similar to Nobilis' 10-K filing in question. *Id.* 33-34.

14

that recognize *revenues* decreased in part due to the accounting change were, under ASC 606, true and accurate.

Second, Defendants' accurately described ASC 606's reporting requirements for subsequent changes in estimates: "With the implementation of ASC 606, we now record all AR adjustments as reductions in revenue, unless they are specifically credit-related." (Ex. 3 at 3; *see also* Ex. 4 at 14 ("[S]ubsequent changes in estimate of collectability due to a change in the financial status of a payor, for example a bankruptcy, will be recognized as bad debt expense in operating expenses.")). Defendants' statements that indicated AR adjustments are reported as reductions in revenue, unless caused by patient-specific changes in credit status, were true and accurate descriptions of current GAAP standards under ASC 606 and ASC 310.

Plaintiff has not stated a plausible § 10(b) and 10b-5 claim based on Defendants' statements about ASC 606.

2.  Statements Related to Nobilis' Financial Reporting and Collection Processes

Defendants' statements about their financial reporting and collection processes also do not constitute actionable misrepresentations. Nobilis' November 9, 2018 press release states, "Over the last several months we have completely overhauled the process and leadership of our revenue cycle and continue to improve our billing and collection processes and procedures. We continue to work towards the collection of receivables." Plaintiff contests the sufficiency of these improvements but does not contest that changes to improve the collections process occurred. Therefore, Plaintiff fails to allege facts that plausibly state that these claims were misleading.

Nobilis' 10-Q filed on August 3, 2018 states, "Based on this evaluation, the Company's disclosure controls and procedures were effective during the six months ended June 30, 2018,

*except for the material weaknesses previously identified in [the Company's 2017] 10-K* for the year ended December 31, 2017 as filed with the SEC on March 12, 2018." (Ex. 4 at 40) (emphasis added). One such weakness identified in the 2017 10-K is the failure to "maintain a sufficient level of review or documentation of approval regarding the Company's management of third-party billing and collections of aged receivables and allowance for doubtful accounts." One of the remedial measures laid out in the same August 3rd 10-Q was "the process of assessing the allowance for doubtful account process and methodology including documenting additional procedures; which includes those designed to add depth to our review procedures." (Ex. 4 at 40).

Nobilis' later announcement on November 9, 2018 that it is "re-evaluating the Net Realizable Value on its Accounts Receivable and intends to make a significant adjustment to the carrying value of accounts receivable" does not contradict its August 3rd statement. The August statement told investors it was reevaluating the process; the November announcement told investors it was reevaluating the amount.[7]

---

[7] In *Central Laborers' Pension Fund v. Integrated Electric Services Inc.*, the court found "public statements and subsequent restatement due to GAAP violations provide some basis to infer scienter." 497 F.3d 546, 572 (5th Cir. 2007). In *Central Laborers'*, though, the "mea culpa" was ultimately insufficient to determine scienter. *Id.* at 555. Moreover, before even getting to the question of weight, *Central Laborers'* is inapplicable here due to timing. The class period in *Central Laborers'* ends with the public acknowledgment of material weaknesses in internal controls that may require restatement of past periods, and begins with the periods actually restated. 497 F.3d at 549. In Nobilis' case, the acknowledgment occurred in March 2018 and the acknowledged weaknesses occurred in 2017. The class period begins in May 2018. In *Central Laborers'*, the identified weaknesses constituted the class period; in the case at hand, the identified weaknesses predate the class period.

Finally, Plaintiff alleges there were other known and unaddressed weaknesses in the reporting process—namely, the CFO's refusal to "write off millions of dollars… for claims that were widely known to be uncollectible throughout the Class Period." Were this true, Nobilis' assurance that "the Company's disclosure controls and procedures were effective" would be misleading. In other words, the reporting process could not be effective if senior management was "cooking the books."   But, the fact that Nobilis overstated the collectability of its account receivables cannot by itself establish fraud. Courts have long rejected pleading "fraud by hindsight." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (citing *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)). Meaning, Plaintiff cannot solely rely on the fact that some of Nobilis' account receivables proved uncollectable; instead, Plaintiff has to allege facts (not conclusions) that would support a conclusion that Defendants made statements about the effectiveness of its disclosure systems and processes that Defendants knew were not true at the time they were made.   To bridge that gap, Plaintiff relies on statements and information from three confidential witnesses, which are detailed above. For the reasons that follow, the confidential witnesses' allegations are insufficient to support a § 10(b) and Rule 10b-5 claim based on Defendants' statements related to Nobilis' financial reporting and collection processes.

Courts discount information from confidential sources because their anonymity frustrates the Court's scienter analysis that weighs plausible competing inferences. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); *Carlton v. Cannon*, 184 F.Supp.3d 428, 460 (S.D. Tex. 2016). To be given any weight at all, a plaintiff must describe the CWs' positions "with sufficient particularity to support the probability that a person in the position occupied by the source … would possess the information pleaded." *ABC Arbitrage Pls. Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002).

17

Here, many of the CWs' allegations establish nothing more than a difference in judgment. For example, "CW1's team urged senior managers to write off these claims as uncollectible, but senior managers made the decision to keep the uncollectible claims on the Company's books." Inferring fraud from this allegation is far from the only possible inference. A strong competing inference is that senior managers disagreed with their employees, thought the claims were still collectable, and wanted to expend every effort to do so. Similarly, CW1 and CW2's belief that Nobilis sought to collect claims at an "impossible rate" is a matter of judgment, not fact. CW allegations that split billing caused the claims' uncollectability is also conclusory. In practice, split billing separates bills by each medical procedure. Insurance subjects each claim to the same approval process. There is nothing nefarious nor determinatively uncollectible about split billing.

Moreover, even assuming split billing results in more uncollectible claims, and even assuming Nobilis materially underreported the amount of uncollectible claims, Plaintiff still does not sufficiently allege that Nobilis' statements to the efficacy of its reporting process were misleading when made. In order to prove Nobilis' reporting process was not adequate because Defendants were "cooking the books," Plaintiff must allege facts to show that Defendants were "cooking the books." As described above, the CWs do not speak to this, and "the fact that something turned out badly [does not establish by itself that] defendant knew earlier that it would turn out badly." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (describing the fraud-by-hindsight doctrine) (citing *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008))

CW3 offers a more factual version of the claim: "nearly half of these outstanding claims were attributable to claims that were denied due to the Company's split billing policy." The claim

18

still suffers from a disconnect between statement and allegation similar to CW1 and CW2. The origin of outstanding claims (from split billing) does not speak to the collectability of the claims. And, once again, an allegation that certain claims had lower collectability provides only the set-up for a claim that Nobilis improperly estimated the collectability of its account receivables—it does not state a claim in and of itself.

Other allegations are outside what the CW would reasonably know given their position. CW2 alleges "Nobilis had, at least, $5 million in questionable, dated claims that the Company knew it could not ultimately collect." However, even assuming "Company" means the senior executives including the individual defendants in this case, it is unclear how a collections specialist in an eight-person team would be privy to the Individual Defendants' knowledge. Similarly, Plaintiff has not provided sufficient detail to explain how CW2, as a *collections* specialist, would have knowledge about the senior director's alleged *billing* of fictious prices. This claim also fails because the accusation is not leveled at any Individual Defendant.

Moreover, the inference that senior executives fraudulently kept uncollectible accounts on their balance sheet is outweighed by the inference that the mis-estimation was made in good faith. Courts give companies' flexibility in the inherently opaque realm of business judgments and asset valuation: "There is no standard of comparison to what the correct numbers would have been. Valuations of assets, especially contracts and assets acquired from bankrupt companies, as well as the application of sophisticated accounting standards like 'fair value,' leave broad scope for judgment and informed estimation; this is another way of saying that determinations on such matters can differ reasonably and sizably." *Shaw*, 537 F.3d at 536 (5th Cir. 2008) (citing *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979) ("'Generally accepted

accounting principles' ... tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management.")).

Finally, only one allegation provides a link between the information presented by the CWs and any Individual Defendant: that "Young came to the business office several times a week between February 2018 and July 2018 to oversee the Company's collection effort."[8] From Young's presence, Plaintiff infers that he must have known the accounts were uncollectible. However, a more plausible competing inference from Young's presence is that he worked with the collections office because he believed the accounts were collectible. After all, dedicating multiple days per week is a large time investment for a CFO just to oversee collection efforts he knows are doomed. His presence supports an inference that he held a sincere belief on the information available to him that the account receivables were collectible. His evaluation may have been wrong, but mistake or even negligence is not sufficient to establish fraud. *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981).

Based on the lack of inconsistent statements and the discounted weight of the confidential witnesses' allegations, Plaintiff has not stated a plausible claim that Defendants' statements about Nobilis' financial reporting and collection processes violated § 10(b) and Rule 10b-5.

### 3. Statements Related to Collection Expectations

Defendant Young's statement about Nobilis' collection expectation also does not constitute an actionable misrepresentation given the Safe-Harbor Provisions in the PSLRA.

---

[8] Put another way, no evidence offered by CWs relates to potential scienter for Klein or Fleming.

In a May 8, 2018 conference call, Young told a shareholder he expected "to collect everything that's on the balance sheet expect to collect."[9] The shareholder confirmed this meant 100%. Close to three months later, in an August 2, 2018 conference call, Young told a shareholder he expected a \$20 million reduction in the \$144 million of outstanding receivables. Plaintiff alleges these representations were inaccurate because "a significant number of accounts from several years ago were based on denied insurance claims or were otherwise uncollectible." (Document No. 25 ¶ 59). However, Defendant Young's statements were predictions: forecasting what he *expected* to happen, and forecasts are protected by PSLRA's Safe-Harbor, forward-looking rule.

The PSLRA gives companies' leeway when making inherently imprecise "projection[s] of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items." 17 C.F.R. § 230.175(c)(1). The Safe Harbor provision applies if a projection is accompanied by a sufficient cautionary statement, if the projection is immaterial, or if the Plaintiff fails to establish actual knowledge that the projection was false when it was made. *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004); 15 U.S.C.A. §§ 77z-2(c); 78u-5c.[10] In general, a forward-looking statement must be "accompanied by meaningful

---

[9] Perhaps an awkward phrasing, but the idea is simple and self-proving: A company expects to collect 100% of what they expect to collect.

[10] Plaintiff cites *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2016 U.S. Dist. LEXIS 5702, at *18 (S.D. Tex. Jan. 19, 2016), to support the proposition that "[t]he safe harbor is inapplicable if a defendant has reason to know that his or her statements are misleading." (Document No. 60, at 7). *Cobalt* in turn relies on *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244 (5th Cir. 2009) ("Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations.").

cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." §§ 77z-2(c)(1)(A)(i); 78u-5c(1)(A)(i); *see also Southland*, 365 F.3d at 372 (requiring cautionary language be "'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors. more specific than just generic, boilerplate disclaimers.").

Because Young made both statements orally on conference calls, the statements are held to a slightly modified standard. For oral forward-looking statements, the company must (i) identify "that the particular oral statement is a forward-looking statement; and (ii) that the actual results might differ materially from those projected in the forward-looking statement." §§ 77z-2(c)(2)(A); 78u-5c(2)(A). Notably, oral forward-looking statements do not require the specificity of forward-looking statements in general, but they do need to identify a readily accessible written document that satisfies those general requirements. §§ 77z-2(c)(2)(B); 78u-5c(2)(B). Nobilis began each

---

However, *Southland*, a 5th Circuit case that preceded *Lormand*, treated actual knowledge and cautionary statements as two "independent prongs." *Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 371 (5th Cir. 2004). If there is a contradiction between the two rulings, the prior-panel-precedent rule mandates a court follow the first ruling on the issue. *Carlton v. Cannon*, 184 F.Supp.3d 428, 453 n.1 (S.D. Tex. 2016) (quoting *Smith v. GTE*, 236 F.3d 1292, 1300 n.8 (5th Cir. 2001) ("[T]he holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court."). For a thorough list of courts that applied *Southland*'s view of a disjunctive safe harbor standard over *Lormand*'s joint standard, see *Hopson v. MetroPCS Commc'ns, Inc.*, Civ. A. No. 3:09-cv-2392-G, 2011 WL 1119727, at *18 n.19 (N.D. Tex. Mar. 25, 2011).

conference call with cautionary statements that warned investors of the variability of forward-looking statements and pointed to a specific 10-K form with disclaimers that specifically identified company-specific risks.

Whether the cautionary statements made at the beginning of each conference call were sufficient to bring Young's projections into the PSLRA's Safe Harbor provision is not entirely clear. In *Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 973 F.Supp.2d 541, 555 (D. Vt. 2013), warnings at the beginning of a conference presentation were determined to be sufficient to place the defendants in the safe harbor; but *In re Sec. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 909-10 (S.D. Tex. 2001), the Court found,

> Defendants may refer to written documents containing meaningful factors, but each particular oral statement must be identified as forward-looking and the cautionary language must warn that actual results might differ materially from those projected in the forward-looking statement. § 78u–5(c)(2). Plaintiff emphasize that the statement at the beginning of the conference calls says nothing more than that forward-looking statements may be included at some point in an extended discussion. Therefore the statutory requirement of identifying each particular oral statement is not satisfied. § 78u–5(c)(2)(B)(I)–(ii).

Although Young's stated expectation about the collectability of the pending accounts receivable was not accompanied by any contemporaneous disclaimer, it is difficult to imagine that such a contemporaneous disclosure would be required when statements are made in a conference call setting. In particular, it seems unreasonable to expect a company and its executives to interrupt a conference call to add a disclaimer to every individual and particular forward-looking statement they may make. Given that the law is not entirely clear on this issue, the undersigned concludes that Nobilis' cautionary statement at the beginning of the conference call was sufficient because it described the kinds of statements with reasonable particularity that are forward-looking and

variable.[11] The cautionary statement therefore meets the burden described in *Golesorkhi*, and is generally consistent with the concerns expressed in *In re Securities Litig.*, insofar as it describes its forward-looking statements with more particularity than just saying, "forward-looking statements may be included at some point in an extended discussion."

Moreover, even if Defendants' cautionary statements were inadequate, the Safe Harbor provision would still apply to Young's statements because—as discussed below—there are no facts alleged from which it could be determined that Young had actual knowledge at the time of the conference call that his statements about the amount of accounts receivable Noblilis expected to collect were false. For that additional reason, Plaintiff has not stated a plausible § 10(b) and 10b-5 claim based on Defendant Young's statements about the expected collectability of Nobilis' accounts receivables.

## B.  Plaintiff has not Sufficiently or Plausibly Alleged Scienter

In addition to a failure to state a plausible, actionable misrepresentation, Plaintiff's allegations also fail to sufficiently and plausibly allege scienter and are subject to dismissal on that basis as well.  Scienter to support a securities fraud claim is an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Southland*, 365 F.3d

---

[11] Exhibit 1: "Some of the statements that we make today may be considered forward-looking, including statements regarding future acquisitions, the expected performance of our business and our long-term growth and innovation. These statements involve a number of risks and uncertainties that could cause actual results to differ materially. For more information, please refer to the risk factors discussed in our Form 10- K for the fiscal year 2017 filed on March 12, 2018 with the SEC."

24

at 366 (internal citations, quotations and ellipsis omitted). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981).

When pleading scienter under PSLRA, Plaintiff's factual allegations must establish a "strong inference" of knowledge or recklessness: higher than the "reasonable inference" burden under 12(b)(6). Moreover, a court must compare inferences that favor the plaintiff with "plausible competing inferences" that favor the defendant. *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008). Finally, courts give less weight to confidential witnesses in the scienter analysis. *In re. Dell Inc.. Sec. Litig.*, 591 F.Sup.2d 877, 895 (W.D. Tex. 2008). In order to sufficiently plead scienter for the corporation Nobilis, Plaintiff must sufficiently plead scienter for an individual defendant acting on behalf of the corporation. *In re BP p.l.c. Sec. Litig.*, 852 F.Supp.2d 767, 818 (5th Cir. 2012).

Plaintiff's First Amended Complaint attempts to establish a strong inference of scienter through Young and Fleming's signed certifications under the Sarbanes Oxley Act of 2002 (SOX), Young's presence in the business office, and the Defendants' corporate positions. First, signatures alone are not sufficient to establish scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Services Inc.*, 497 F.3d 546, 555 (5th Cir. 2007). In *Ramirez v. Exxon Mobil Corp.*, scienter was inferred from the defendant's signature where the defendant also received in-depth briefings and was directly involved in the drafting of the report. 334 F. Supp. 3d 832, 854 (N.D. Tex. 2018). Here, there are no allegations about any additional involvement of Defendant Fleming of the kind described by *Ramirez*. As for Defendant Young, perhaps his presence in the office could be an analogous circumstance to direct involvement and in-depth briefings in *Ramirez*. However, as

described above, Young's presence in the office supports a strong competing inference that he believed the accounts receivable were collectable. Young's signature on certifications and his presence in the office are insufficient to support a *strong* inference of scienter as it relates to any of the alleged misstatements or misleading statements at issue in this case.

As for Defendants' respective positions with the company, the 5th Circuit has generally found that "pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). A plaintiff may sometimes establish a sufficient inference of scienter through special circumstances, but the Fifth Circuit and other courts have been reluctant to apply this limited exception. In such rare cases, nonetheless, "[a]n officer's position within a company can support the scienter inference only when viewed with other, "special circumstances." These include (1) a small company in which corporate executives are likely to be familiar with day-to-day operations, (2) transactions "critical to the company's continued vitality," (3) omitted information readily apparent to the speaker, and (4) internally inconsistent statements by the officer." *Carlton v. Cannon*, 184 F.Supp.3d 428, 459-60 (S.D. Tex. 2016) (citing *Local 731 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes, Inc.*, 810 F.3d 951, 959 (5th Cir. 2016) (internal citations omitted)). However, successfully pleading such a special circumstances exception is exceedingly rare, and has heretofore only been applied when a small company is involved. *Alaska Elec. Pension Fund v. Flotek Ind., Inc.*, 915 F.3d 975, 985 (5th Cir. 2019) ("However, we have never found special circumstances permitting an inference of scienter based solely on a defendant's position when the company was large.").

Here, the special circumstances exception for alleging scienter simply does not apply. Plaintiff does not allege any facts to show that Nobilis is a small company. Indeed, at nine hundred

employees (seven hundred full time), Nobilis easily clears the threshold on this issue. *See Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (finding 60+ employees failed to establish a small company in the special circumstances analysis).[12]

As for the remaining special circumstances factors, they do not support a strong inference of scienter either. First, as discussed above in connection with the determination that the alleged misrepresentations are not actionable, the alleged accounting inconsistencies of which Plaintiff complains are resolved by noting the difference between revenue and net income. Second, the only facts alleged to establish readily-apparent information is Young's presence at the business office. However, as described above, matters that may appear clear in hindsight do not constitute fraud when looking back. Furthermore, Young's presence suggests he sincerely believed the assets were collectible, which strikes against a theory that their uncollectability was readily apparent.

Third, while the collectability of Nobilis' accounts receivables was arguably a critical issue, this by itself would be insufficient to warrant inferring scienter. Plaintiff claims a senior director—not a defendant in this case—allegedly told CW2 "that Nobilis needed to collect, at least, $5 million in aged receivables to be able to sustain the Company's financial stability." (Document No. 25 ¶ 83). If taken as true, this supports an inference that collecting on account receivables was sufficiently urgent that Defendants would be informed about, and possibly involved with, the process. Thus, the transactions may be critical, but only barely so under existing precedent. There

---

[12] A plaintiff has successfully classified a defendant as a small company for the scienter analysis when that company consisted of eight employees, *Dorsey v. Portfolio Equities. Inc.*, 540 F.3d 333, 342–43 (5th Cir. 2008), and roughly thirty-five employees, *Nathenson v. Zonagen. Inc.*, 267 F.3d 400, 425 (5th Cir. 2001).

is a high bar for what counts as "critical," with even sources generating 22%, 29%, and 30% of a company's total revenue having been found insufficient as a special circumstance to create a strong inference of scienter based on an individual defendant's corporate position and presence alone. *Neiman*, 854 F.3d at 750, *Alaska Elec. Pension Fund v. Asar*, 768 Fed.Appx 175, 188 (5ᵗʰ Cir. 2019), *Edgar v. Anadarko Petroleum Corp.*, Civ. A. No. H—17-1372, 2019 WL 1167786 at *17 (S.D. Tex. Mar. 13, 2019). A plaintiff must adequately plead that the company's continued existence *depends* on the transaction. *See Edgar*, 2019 WL 1167786 at *17 ("[W]hile the second amended complaint alleges that Anadarko's Colorado wells accounted for 30.1% of its worldwide oil production, it does not allege that the company's existence hinged on its operations there."). Nonetheless, even if Nobilis' continued existence depended on collecting this $5 million in aged receivables, Plaintiff still fails to establish, for the special circumstances exception to apply to the pleading of scienter, inconsistency, readily apparent, and most importantly, that Nobilis was a small company.

In all, because the special circumstances exception for pleading scienter does not apply and because the individual Defendants' positions with Nobilis and their presence at Nobilis' offices is insufficient to established a strong inference of scienter, Plaintiff has not plausibly alleged scienter and dismissal of Plaintiff's § 10(b) and Rule 10b-5 claims is warranted. Additionally, because a § 20(a) claim cannot survive when claims under § 10(b) and 10b-5 have been dismissed, the § 20(a) claims are subject to dismissal as well.[13]

---

[13] *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) ("Control person liability is secondary only and cannot exist in the absence of a primary violation."); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 380 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Tr. U/A DTD 9/21/72 v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) ("Thus, the

## V.     Conclusion and Recommendation

Based on the foregoing, and the conclusion that Plaintiff has not stated a plausible claim under § 10(b), Rule 10b-5 or 20(a), the Magistrate Judge

RECOMMENDS that Defendants' Motions to Dismiss (Document Nos. 26 & 28) both be GRANTED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed R. Civ. P. 72(b). Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), cert. denied, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 25th day of $\underline{June}$ , 2020.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

---

failure of a plaintiff to state adequately a 10(b) claim for primary securities fraud violations constitutes a failure to state a claim for control person liability under Section 20(a).")